# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PETER SCHEMAN and ANDREW SCHEMAN, | ) ) ) |
| Plaintiffs, | ) ) ) Case No. |
| v. | ) ) |
| MICHAEL C. WINTER and JUPITER PHARMA LLC, | ) JURY TRIAL DEMANDED ) ) |
| Defendants. | ) |

## COMPLAINT

Plaintiffs Peter Scheman and Andrew Scheman (together, "Plaintiffs"), by their attorneys, Hinshaw & Culbertson LLP and Eiseman Levine Lehrhaupt & Kakoyiannis, P.C., aver for their complaint, upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 because the claims are between citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs. Additionally, this Court has jurisdiction pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act (15 U.S.C. §78aa), as the claims asserted herein arise under and pursuant to

Sections 10(b) of the 1934 Act (15 U.S.C. §78j(b) and §78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5).

2. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated" in this District.

## THE PARTIES

3. Plaintiff Peter Scheman ("Scheman") is an adult individual and a resident of the State of New York.

4. Plaintiff Andrew Scheman is an adult individual and a resident of the State of New York.

5. Defendant Michael C. Winter ("Winter") is an adult individual and a resident of the State of Illinois.

6. Defendant Jupiter Pharma LLC ("Jupiter Pharma" or the "Company") is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 3590 West 3rd Avenue, Eugene, Oregon 97402

## FACTUAL ALLEGATIONS

**Formation of Jupiter Pharma**

7. Winter formed Jupiter Pharma on or about April 22, 2019.

2

8. At the time of its formation, Winter owned one hundred percent (100%) of Jupiter Pharma.

9. Jupiter Pharma was formed to engage in the business of cultivating, processing, and marketing industrial hemp.

10. Upon formation of Jupiter Pharma, Winter appointed himself the Chief Executive Officer and sole managing member of Jupiter Pharma.

**Scheman's Investment In Jupiter Pharma**

11. Within days of the Company's formation, Winter and non-party Adam Hakim ("Hakim") both reached out to Peter Scheman in an effort to induce him to invest in the Company.

12. Hakim had a relationship with both Winter and Peter Scheman and served as the intermediary who introduced Peter Scheman to Winter and Jupiter Pharma.

13. Specifically, Hakim and Scheman have known each other for over thirty-five years and they have had a relationship since they were both in high school.

14. In early Spring 2019, Hakim called Scheman and told him about Winter and Jupiter Pharma.

15. After Scheman expressed some initial interest in potentially investing in Jupiter Pharma, Hakim scheduled a meeting so that Winter and Scheman could meet in person.

16. On May 1, 2019, Hakim and Winter came to Scheman's office to discuss a potential investment in the Company.

17. Shortly thereafter, Winter sent Peter Scheman an "investment deck" for the Company. He also had the Company's outside counsel send Scheman a Private Placement Memorandum (the "PPM").

18. After their initial meeting on May 1st, Winter and Scheman had a series of conversations and e-mail exchanges so that Scheman could, *inter alia*, gain a better understanding of: (i) the Company's business, (ii) the capital necessary to run the business, and (iii) the terms of Scheman's potential investment in the Company.

19. In their conversations, Winter also repeatedly told Scheman that, if Scheman invested, Winter would place either him or his brother on an Advisory Board for Jupiter Pharma that Winter was going to create.

20. Scheman also had multiple conversations and e-mail exchanges with Hakim about his potential investment in the Company.

21. Scheman told Winter that he had several reservations about making an investment in Jupiter Pharma.

22. Scheman's two primary reservations – which he reiterated to Winter on multiple occasions – concerned the amount of capital being raised and the amount of capital needed to run the business.

4

23. Scheman told Winter that it was his experience that startups like Jupiter Pharma almost always require more money than projected and more time than anticipated to reach profitability.

24. Therefore, before investing, Scheman wanted confirmation that the Company would have sufficient capital to run its operations before it reached profitability.

25. Indeed, Scheman expressly told Winter that he would not invest in the Company if it did not have sufficient capital at the outset.

26. In his conversations with Scheman, Winter told Scheman that Jupiter Pharma needed to raise $15 million in equity for the Company to be viable.

27. During multiple telephone conversations that took place in May 2019, Winter repeatedly told Scheman that the Company was "getting close" to reaching its goal of raising $15 million in equity.

28. Winter also told Scheman that he had multiple additional interested investors and that he had commitments from a number of them as well.

29. During these May 2019 conversations, Scheman consistently reiterated to Winter that the only way he would be comfortable investing in the Company is if he first received confirmation that the Company raised the full $15 million.

30. Scheman also told Winter that he did not want his equity position to be diluted if the Company ever needed to raise additional funds. Winter agreed that any

5

potential future investors' equity would come from his ownership interest – and not Scheman's.

31. Subsequently, in a telephone conversation in late May 2019, Winter informed Scheman that the Company had reached its goal of raising $15 million in equity.

32. Shortly thereafter, on May 30, 2019 -- immediately before Scheman made his investment -- Scheman sent an e-mail to Winter to confirm that the $15 million had been raised.

33. Winter responded the same day and stated: "Hi Peter, **the total equity raise was $15,000,000**. All investors are wiring to the escrow as they sign the PPM." A copy of Winter's response is attached hereto as Exhibit A (emphasis added).

34. Scheman reasonably believed the representations made by Winter that Jupiter Pharma had reached its goal of receiving $15 million.

35. This fact was critical because it demonstrated to Scheman that the Company was able to raise the funds necessary for it to operate as a viable business. Moreover, Scheman told Winter that he did not want to be the sole or primary investor in Jupiter Pharma. After all, based on Winter's own projections, the Company needed to raise more than 10 times the amount Scheman was willing to invest for it to be able to operate.

36. In addition, Scheman reasonably believed Winter's representations that he or his brother would be made a member of the Company's Advisory Board. This was important to Scheman because it would allow him to have input into the operations of the Company and monitor that his investment was being used appropriately.

37. In reliance on Winter's representations, Scheman invested $1 million in Jupiter Pharma pursuant to a Subscription Agreement, dated June 3, 2019.

38. Winter also sought an investment in the Company from Scheman's brother. With Winter's knowledge, Scheman relayed to his brother the information Winter provided to Scheman.

39. In reliance on Winter's representations, Scheman's brother, Andrew, invested a total of $350,000 in Jupiter Pharma. Andrew Scheman's investment was made in three tranches -- $100,000 on May 30, 2019, $100,000 on June 5, 2019, and $150,000 on September 25, 2019.

**Winter's Misrepresentations And Mismanagement Come To Light**

40. Since April 22, 2019, Jupiter Pharma has been governed by a two-page Operating Agreement (the "Operating Agreement").

41. Pursuant to the Operating Agreement, "[t]he management, operation and control of the Company shall vest in the Manager." Operating Agreement ¶ 9.

42. In addition to being Jupiter Pharma's Manager, Winter is also its Chief Executive Officer.

43. Thus, Winter controls Jupiter Pharma's day-to-day operations and its management.

44. Throughout the summer and fall of 2019, Winter and Scheman communicated periodically and Winter repeatedly told Scheman that the Company was performing well and growing as expected.

45. Scheman only discovered the truth in December 2019 during a telephone conversation with Hakim.

46. During that call, Hakim told Scheman that the Company was actually in turmoil and had never raised the $15 million as Winter represented.

47. In December 2019 and January 2020, Scheman participated in multiple phone calls with Winter, Hakim, and others in an effort to learn the true state of Jupiter Pharma.

48. Scheman confirmed that what Hakim had told him was correct: Winter's statements about raising $15 million were fabrications and the Company was failing due to Winter's mismanagement and a lack of sufficient capital.

49. Scheman learned that the Company had raised only $3.5 million in equity – with $1.35 million of that amount coming from Scheman and his brother.

50. Thus, the Schemans' investment represented more than 35% of the total equity investment in Jupiter Pharma.

51. And, rather than being one of many investors in a company with sufficient cash to fund its operations, the Schemans found themselves to be one of a small number of investors in a cash-strapped company.

52. Critically, this lack of cash meant that Jupiter Pharma did not have the funds necessary to run its operations.

53. For example, by the end 2019, the Company was almost entirely out of cash and had no funds to purchase machinery or commercialize the hemp it owned.

54. Nor could the Company take advantage of the rights it had with respect to harvesting and purchasing significant additional amounts of hemp.

55. Therefore, Jupiter Pharma's hemp remains stuck in a warehouse mostly unused and unusable.

56. Indeed, although Winter told Scheman that the hemp the Company owned was worth approximately $8-12 per pound, it is now worth only 10% of that and is wasting away in the Company's warehouse.

57. If Jupiter Pharma actually had the $15 million in investment dollars as Winter represented before the Schemans invested, the Company would have had the wherewithal to commercialize and sell the hemp at a profit as well as take advantage of its rights to obtain significant additional amounts of hemp.

58. And, as Scheman made clear to Winter at the time, had the Schemans known the true amount of funds Winter raised, they would never have invested in Jupiter Pharma.

59. After Scheman learned the true state of the Company, he repeatedly voiced his concerns to Winter.

60. However, over the course of 2020, Winter became defensive and made it clear that Scheman's input was not welcome.

61. Furthermore, even though Winter had promised that Scheman would be placed on the company's Advisory Board to induce the Schemans' investment, Winter never did so.

62. Nor did Winter ever appoint Jupiter Pharma's board of managers – even though the PPM specifically requires it.

63. Rather, Winter refused to relinquish any control over the Company or to even agree to any oversight from the other members of Jupiter Pharma.

64. And, despite the Company's desperate need for cash, Winter unilaterally decided to take a $300,000 annual salary for 2019, in addition to approximately $80,000 in expense reimbursements.

65. As Jupiter Pharma continued to flounder, Scheman reiterated to Winter that he had serious concerns about the way Winter was operating the Company and the future viability of the Company.

66. Scheman explained that absent serious changes, no party would receive any of the anticipated returns on their investment because the value of Jupiter Pharma was being materially impaired by the acts and omissions of Winter.

67. Yet Winter continued to refuse to consider any of Scheman's efforts to salvage the Company.

68. Therefore, on multiple occasions in 2020, Scheman told Winter that he believed that the best course of action was for the Company to liquidate and thereby enable Jupiter Pharma to ensure at least some return for all its members. Winter refused.

69. To this day, the Company has no remaining cash, no operations, and no way of becoming profitable.

## COUNT I
**Fraudulent Inducement**

70. Plaintiffs repeat and reallege paragraphs 1 through 69 above as if fully set forth herein.

71. Winter and Jupiter Pharma knew or should have known that they provided false and misleading information to Scheman concerning: (i) the amount of funds raised by Jupiter Pharma, (ii) the number of investors in Jupiter Pharma, and (iii) the role Scheman would have as a member of Jupiter Pharma's Advisory Board, in order to induce Plaintiffs to invest $1.35 million in the Company.

11

72. Winter and Jupiter Pharma knew or should have known that the information they provided to Plaintiffs was materially false and misleading.

73. Winter and Jupiter Pharma knew or should have known that, had the truth been disclosed, Plaintiffs would not have made an investment in Jupiter Pharma.

74. As Winter and Jupiter Pharma intended, Plaintiffs reasonably relied on the information provided by Winter in deciding to make their $1.35 million investment in Jupiter Pharma.

75. As a direct and proximate result of Plaintiffs' reasonable reliance on the materially false and misleading information that was provided by Winter and Jupiter Pharma, Plaintiffs incurred damages in an amount to be determined at trial, but no less than $1.35 million.

## COUNT II
### Violation of §10(b) of the 1934 Act and Rule 10b-5

76. Plaintiffs repeat and reallege paragraphs 1 through 75 above as if fully set forth herein.

77. The shares of Jupiter Pharma – including the shares Plaintiffs received in exchange for their investment – constitute securities under United States law.

78. Winter and Jupiter Pharma knew or should have known that they provided false and misleading information to Scheman concerning: (i) the amount of funds raised by Jupiter Pharma, (ii) the number of investors in Jupiter Pharma, and (iii)

the role Scheman would have in overseeing the management of Jupiter Pharma, in order to induce Plaintiffs to invest $1.35 million in the Company.

79. Winter and Jupiter Pharma knew or should have known that the information they provided to Plaintiffs was materially false and misleading.

80. Winter and Jupiter Pharma used instrumentalities of interstate commerce, including e-mail and telephone, in connection with the sale of Jupiter Pharma's shares to Plaintiffs.

81. Plaintiffs justifiably relied on Winter's and Jupiter Pharma's false and misleading statements of material facts in their purchase of shares of Jupiter Pharma.

82. Winter's and Jupiter Pharma's misrepresentations caused Plaintiffs to incur damages in an amount to be determined at trial, but no less than $1.35 million.

**WHEREFORE**, plaintiffs Peter Scheman and Andrew Scheman demand judgment as follows:

A. Awarding Plaintiffs compensatory damages as a result of the wrongs alleged in the Complaint in an amount to be determined at trial;

B. In the alternative, declaring a recission of Plaintiffs' investments in Jupiter Pharma and compensatory damages as a result of the wrongs alleged in the Complaint in an amount to be determined at trial;

C. Awarding the costs of this action to the extent permitted by law, including attorneys' fees; and

    D. Such other and further relief as this Court deems just and proper.

| | |
|---|---|
| Dated: March 29, 2021 | Respectfully submitted, |
| | HINSHAW & CULBERTSON LLP |
| | By:/s/*Adam R. Vaught* |
| | EISEMAN LEVINE LEHRHAUPT & KAKOYIANNIS, P.C. |
| | By: *Eric R. Levine* |
| |     *Pro Hac Vice Motion Pending* |

Adam R. Vaught  6287595
avaught@hinshawlaw.com
Shelley M. Bethune
sbethune@hinshawlaw.com
Hinshaw & Culbertson LLP
Local counsel for Plaintiffs,
Peter Scheman and Andrew Scheman
151 North Franklin Street, Suite 2500
Chicago, Illinois  60606
312.704.3854

Eric R. Levine
elevine@eisemanlevine.com
Eric Aschkenasy
easchkenasy@eisemanlevine.com
EISEMAN LEVINE LEHRHAUPT
& KAKOYIANNIS, P.C.
Attorneys for Plaintiffs, Peter Scheman
and Andrew Scheman
*Pro Hac Vice Motion Pending*
805 Third Avenue
New York, New York 10022
212.752.1000